ANTHONY S. SMITH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Smith v. Commissioner
Docket No. 2075-75.
United States Tax Court
T.C. Memo 1977-10; 1977 Tax Ct. Memo LEXIS 432; 36 T.C.M. (CCH) 58; T.C.M. (RIA) 770010; January 17, 1977, Filed Anthony S. Smith, pro se. Leo A. Reinikka, Jr., for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief Judge: Respondent determined a deficiency in petitioner's Federal income tax for the calendar year 1971 in the amount of $2,878 and an addition to tax of $143.90 pursuant to the provisions section 6651(a), Internal Revenue Code of 1954.[1] Due to concessions made by respondent at trial, we must decide (1) whether petitioner sustained a long term capital loss in the amount of $14,665 during the taxable year 1971 when his wholly owned Westport Crab and Oyster Company went out of business, (2) whether petitioner is entitled to a $5,000 business bad debt deduction in that same year with respect to a purported personal loan to the company, and (3) *433 whether the circumstances surrounding petitioner's filing of his 1971 Federal income tax return justify respondent's imposition of an addition to tax under section 6651(a) of the Code.
The parties in this case were unable to effect a stipulation of facts with respect to any of the questions presented for decision. Our findings, therefore, are based solely upon the tangible evidence adduced at trial and petitioner's own testimony. FINDINGS OF FACT Petitioner's legal residence was Vancouver, Washington at the time his petition was filed herein. On April 24, 1972, petitioner and his then wife, Phyllis J. Smith, filed a joint Federal income tax return for taxable year 1971 with the Internal Revenue Service Center, Ogden, Utah. The Westport Crab and Oyster Company (hereinafter referred to as Westport) was established by petitioner in Vancouver, Washington during January 1971. Petitioner was Westport's only officer or owner. Primarily due to poor management, Westport went out of business prior to December 31 of that same year. Little is known of Westport's activities *434 during 1971 except that it regularly purchased fish from fishermen for resale, and that normally those fishermen would demand cash payments at date of purchase in return for their catches. Westport's state charter was allowed to expire after 1971. Since no assets remained except for the building, petitioner never filed for bankruptcy or officially caused the company to be dissolved. Petitioner did not attempt to resuscitate Westport at any later date, although he subsequently did cause its building to be leased to unnamed third parties who established a similar business. Petitioner was involved in a series of financial transactions during the early part of 1971. On January 14, 1971, he paid "Willis H. & Blanche Bross" $4,000 with printed check number 254 drawn on his personal account at the First National Bank of Oregon. That check carried handwritten notations on its face of "ERNEST MONEY RE WESTPORT CRAB & OYSTER MK" and "Royal Investment Inc." Shortly thereafter, on January 17, petitioner paid $300 to "Gallup & Duggan, Atty" with printed check number 255 drawn on the same personal account. Notations appearing on the face of this instrument are "Royal Investments Inc" and *435 "G & D Trust." Each of those notations seems to have been made by a different writer. On January 22 petitioner paid $2,814.46 to "Willis & Blanche Bross" with printed personal check number 259 drawn upon his First National Bank of Oregon account. The only notations on the face of that instrument are a partially illegible one beginning "Balance on…" and another line below the first which has been obliterated subsequent to its creation. The only fact established with respect to Westport during January 1971 is that the company's commercial account with the First National Bank of Oregon had a balance of $3,751.48 on January 29, 1971, by virtue of a deposit of that amount made on January 25 by an unknown depositor. Nothing is known about either petitioner's or Westport's financial dealings during February 1971. Petitioner cashed a $3,000 counter check payable to "Cash" drawn on his personal account at the First National Bank of Oregon on March 17. That check bears no notation concerning the purpose underlying the withdrawal. Three days later, on March 20, petitioner paid "Capital Savings & Loan" $5,000 with printed check number 736 drawn upon his personal account at the First *436 National Bank of Oregon. That check is devoid of notations. The record is silent concerning either petitioner's or Westport's specific activities throughout the remainder of calendar year 1971. On October 24, 1973, Steven A. Memovich, an attorney in Vancouver, Washington, sent a letter to James J. Pomajevich, an attorney in Portland, Oregon, enclosing a trust account check in the amount of $2,300 in full settlement of two state court actions against petitioner and Mrs. Smith and asking that the court actions be dismissed. The two cases had been brought by United Adjusters, Inc., in the Multnomah County District Court. No indication is given as to the source of those funds, the nature of the actions, or the ultimate disposition of either case. Petitioner mailed his joint 1971 return to the Internal Revenue Service Center at Ogden, Utah, in the standard envelope provided by respondent for such purposes on April 24, 1971. That return, which was signed and dated by petitioner on April 17, 1971, was received by the Service Center on April 25, 1971. OPINION At the outset we cannot overemphasize the burden of proof which must be borne by the petitioner. Rule 142, Tax Court *437 Rules of Practice and Procedure. This burden falls equally upon taxpayers represented by counsel and those appearing on their own behalf. Petitioner's presentation of the facts was woefully inadequate at trial when measured by any standard. We are forced to rely upon that evidence, however, because of petitioner's failure to (1) produce his personal and corporate records for respondent to examine prior to trial, (2) cooperate with respondent on a stipulation of facts prior to trial, (3) produce a significant amount of supporting evidence at trial, and (4) assist in respondent's examination of certain purported business records during the 45-day period the record was kept open in this case after trial. Our findings of fact reflect only a small portion of the evidence presented by petitioner. These facts, however, as drawn from petitioner's tangible evidence, represent all that we comfortably can draw from the record. Petitioner asserts that his basis in Westport was $14,665 when the company closed its doors late in 1971 after allegedly having depleted its assets. That basis purportedly was comprised of (1) an $800 cash contribution to capital by petitioner at the time Westport *438 was founded, (2) a $3,751 deposit petitioner made to Westport's commercial account at the First National Bank of Oregon in January 1971 from his personal funds, (3) petitioner's payment of $300 out of his personal funds to the attorneys which allegedly assisted him in establishing the company, (4) two payments totaling $6,814.46 made by petitioner to Willis and Blanche Bross during January 1971 from his personal account for the purchase of business inventory, and (5) a $3,000 cash contribution he made to the company on March 17, 1971, with money drawn from his personal account. Petitioner asserts further that he loaned Westport $5,000 on March 20, 1971. Since that amount was not repaid by the company before it ceased business operations, petitioner claimed a $5,000 business bad debt deduction on his Federal income tax return for the taxable year 1971. Petitioner introduced into the record a $5,000 note allegedly issued him by Westport in return for the cash advance and his personal check of $5,000 to Capital Savings and Loan as supporting evidence for this claim. Respondent contends that petitioner is not entitled to the capital loss deduction or the business bad debt deduction *439 because of his failure to prove the facts and circumstances surrounding each of the component elements of his claims. Petitioner's failure to provide any concrete evidence of his alleged financial dealings in 1971 leaves us no choice but to sustain respondent's determination on each issue before us. The evidence presented by petitioner is susceptible to many interpretations, few of which are favorable to him. His own testimony adds nothing to his case because we think his credibility is open to serious question. We are not persuaded that the two checks to the Brosses represented purchases of business inventory. Moreover, we are not convinced that the January 21, 1971, check to "Gallup & Dugan" in the amount of $300 was tendered as payment for services rendered during Westport's creation. Two of the three checks involved in these transactions bear the notation "Royal Investments, Inc.," which was not explained at trial. Although Westport had a commercial checking account at the First National Bank of Oregon as early as January 25, 1971, these alleged payments on its behalf were made not from the funds therein, but from petitioner's private funds through the issuance of personal *440 checks. We have nothing before us except petitioner's testimony to pinpoint this one Gallup & Dugan check as payment for services rendered with respect to Westport. Petitioner made no attempt to introduce into the record documents such as Westport's state charter, Westport's articles of incorporation, a written sales contract with the Brosses, or an itemized billing for legal services which might support his claims. The mere fact that Westport had a checking account balance of $3,751.48 on January 29, 1971, does not shed any light upon the source of those funds. Absent any supporting evidence, we cannot accept petitioner's claim that he made a $3,000 cash contribution to Westport's capital on or about March 17, 1971. Petitioner did withdraw $3,000 from his personal checking account on that date by cashing a counter check at the main branch of the First National Bank of Oregon, but we have nothing other than his testimony to support his claim that these funds ultimately were contributed to Westport's capital. Westport's books and records showing cash flow, changes in equity account, or checking account deposits would have tended to substantiate such assertions if they had been *441 offered into evidence. We note that petitioner's submitted summary of his investment in Westport indicates that the source of this $3,000 contribution was a loan from the First National Bank of Oregon, manifested in note number 13818. This confuses the issue inasmuch as we do not know whether he obtained the loan in his personal capacity or in Westport's name. Petitioner did not mention the loan at trial or introduce a copy of the note into evidence. Similarly, we find that petitioner did not make a claimed $800 cash contribution to Westport's capital in January 1971. There simply is no credible evidence to support such a claim. Petitioner is not entitled to a business bad debt deduction for an unrepaid loan in that amount which he purportedly made to Westport on or about March 20, 1971. The only evidence presented on this point consisted of petitioner's testimony, a $5,000 personal check that petitioner wrote to Capital Savings and Loan on March 20, 1971, and a note purportedly issued to petitioner in that amount by Westport on the same date. Petitioner signed that note as Westport's chief executive officer. Several inconsistencies in the record cause us to reject the *442 claimed deduction. Petitioner's testimony at trial was evasive, conflicting, and entirely self-serving on this point. A $5,000 personal check made out to Capital Savings and Loan, barren of notations, is not persuasive evidence that petitioner ever made a loan to Westport in any amount. Furthermore, the purported note from Westport to petitioner evidencing the alleged loan presents the most glaring inconsistency. The document introduced into evidence is a printed form note used by the Northwest Bank which petitioner altered to represent a debt owed by Westport to him by striking out the bank's name, inserting his name as payee, and supplying the appropriate numbers. Although the note was dated March 20, 1971, we cannot overlook the date the note form was adopted by Northwest Bank set forth in the lower right hand corner of the face of the note. That date is "11/71," which is almost eight months after the note allegedly was created. Such an irregularity serves to vitiate any credibility which the proffered evidence might otherwise have possessed. We face a similar problem with respect to Westport's alleged corporate income tax return for 1971. That document, petitioner's exhibit *443 8, is a Form 1120 which has been filled out entirely in pencil. Petitioner contends that the exhibit is a copy of a timely filed original. Respondent asserts that it has no record of any such return being filed, and, moreover, questions the authenticity of the exhibit because it bears a "3/15/71" date of signature while purporting to represent the entire calendar year 1971. The normal filing deadline for such a return would be March 15, 1972.
Both of these irregularities cause us to place little weight on petitioner's testimony. Since he premised his case almost exclusively on that testimony, his burden of proof remains unsatisfied on all issues. We can perceive nothing in the record which supports his claims. Petitioner offered no evidence to show whether his Federal income tax return for 1971 was timely filed or whether the failure to timely file the return was due to reasonable cause. In fact, there is evidence to the contrary. The envelope in which the 1971 return was mailed bears the postmark date of April 24, 1972, and the Ogden Service Center did not receive it until April 25, 1972. Therefore, we conclude that his failure to timely file the return was due to willful *444 neglect under section 6651(a) of the Code. Accordingly, to reflect the conclusions reached herein and the concessions made by respondent, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩